[Cite as *State v. Williams*, 2015-Ohio-172.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
No. 101121

**STATE OF OHIO**

PLAINTIFF-APPELLEE

vs.

**EVONTAE WILLIAMS**

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-13-575422-A

**BEFORE:** Boyle, P.J., Celebrezze, A.J., and Keough, J.

**RELEASED AND JOURNALIZED:** January 22, 2015

**ATTORNEY FOR APPELLANT**

Steve W. Canfil
2000 Standard Building
1370 Ontario Street
Cleveland, Ohio   44113-1899

**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
BY:   Norman Schroth
Assistant County Prosecutor
Justice Center, 8th Floor
1200 Ontario Street
Cleveland, Ohio   44113

MARY J. BOYLE, P.J.:

{¶1} Defendant-appellant, Evontae Williams, appeals his conviction for murder, raising five assignments of error:

> I. The trial court violated appellant's constitutional rights and abused its discretion when it overruled defense objections and permitted the state's witnesses to provide inadmissible hearsay testimony and to identify appellant as the shooter.
>
> II. The trial court abused its discretion when it, over timely objection, instructed the jury that flight may be considered as evidence of guilt.
>
> III. The trial court erred when it went directly to closing argument without inquiring of the defendant if he had defense witnesses or if he wanted to exercise his right to testify on his own behalf, and without providing opportunity to the defense to rest and to re-argue its motion for acquittal.
>
> IV. The trial court erred in denying appellant's motion for acquittal because the state presented insufficient evidence of guilt.
>
> V. The verdicts were against the manifest weight of the evidence.

{¶2} Finding no merit to the appeal, we affirm.

<u>Procedural History and Facts</u>

{¶3} In July 2013, after being transferred from the juvenile division to the general division of the common pleas court pursuant to a mandatory bindover, Williams, age 17, was indicted on two counts of murder in violation of R.C. 2903.02(A) and (B); and two counts of felonious assault in violation of R.C. 2903.11(A)(1) and (2), with all counts carrying one- and three-year firearm specifications. The charges arose in connection with the fatal shooting of Kortez McRae ("the victim") on March 24, 2013. Williams pleaded not guilty to the charges, and the matter proceeded to a jury trial.

{¶4} We summarize the following relevant facts from the evidence presented at trial. We will discuss the facts further in our disposition of the stated assignments of error.

{¶5} The charges against Williams, also known as "Ebay," arise out of the fatal shooting of Kortez McRae on March 24, 2013, at approximately 1:00 a.m., outside a house on East 66th Street following a "kickback" party at that home, starting the night before on March 23rd. The party included drinking, smoking, and dancing inside the house. According to the witnesses' accounts, there were "a lot" of people at the party, anywhere from 30 to 50 people, who ranged in age from teenagers to young adults.

{¶6} Kortez arrived to the party with his two cousins, Shawn Wright and Dalleo Wright. Dalleo testified that he heard about the party from his friend, Fred Smith, and that he knew Snoop, the host of the party. Dalleo further testified that his brother, Demario Wright ("Mario"), and his cousin, Deon Day, also attended the party.

*A.     Altercation Between Williams and Dalleo Erupts Inside the House*

{¶7} At some point during the party, Williams and Dalleo Wright, who did not know each other, got into an altercation over Williams stepping on Dalleo's feet while Williams was dancing. Dalleo testified that he told Williams "to scoot over," which he did not do and instead "started saying something," prompting Dalleo to push Williams. Dalleo further testified that, once he pushed Williams, "he was coming towards me and they starting pushing me in the dining room and pushing him the other way" into the living room. The confrontation ultimately escalated to the entire party going outside in anticipation of a fight.

*B.     Crowd Screams "Ebay" and Dalleo Chases Williams*

{¶8} According to Dalleo, he walked outside and "then everybody that was in the inside came outside," including Williams. At some point while outside, Dalleo "heard some shots go off * * * on [his] right side." Dalleo testified that he looked over in the direction of the shots and saw Kortez, who was standing by the car, "falling to the ground." Dalleo testified that, after

hearing the shots, the crowd, which seemed in shock, started screaming "no, Ebay." Dalleo further testified that he assumed Williams was the person that did it "since he was running" and "putting his hand in his pocket." Dalleo chased Williams but lost him when he ran back inside Snoop's house. According to Dalleo, Williams was the only person who ran following the shooting.

{¶9} Dalleo identified Williams in court as the same person who stepped on his feet inside the house and the one running away from Kortez. Dalleo also testified that he had identified Williams in a photo array following the shooting, even though Williams looked different on the night of the shooting — that night he had tattoos on his face, and his hair was longer. Dalleo testified that Williams had dreads.

C.     *According to Shawn Wright, Clothing of the Shooter and Person Who Fought Dalleo was the Same*

{¶10} Shawn Wright testified that he was standing next to Kortez outside by the car parked right across from the house, away from Dalleo and his other cousins, when the shots were fired. According to Shawn, his cousins, Dalleo, Mario, and Deon, were standing in the crowd, which had spilled out of the house into the street in front of the house. Shawn testified that he never saw the face of the shooter because the shooter's face was obstructed by the shooter's arm. Shawn stated that he did see the person's clothes, which were the same clothes as the person fighting with Dalleo earlier inside the house.

D.     *Fredrick Smith Identifies Ebay Running with Gun*

{¶11} Fred Smith testified that he was "cool" with both Dalleo and Ebay and that he had tried to break up their fight before it went outside. According to Fred, approximately six guys were with Ebay inside the house. Fred further testified that, once outside, he was positioned in between Ebay and Dalleo. He further testified that, after being outside approximately 15 minutes

and while pushing Dalleo, who was in the street, back toward the car, he heard two gunshots. According to Fred, the gunshots came from behind him so he immediately turned around and "I seen Ebay running * * * with the gun." Fred stated that the gun was a black revolver. Fred further testified that Dalleo ran by him, chasing Ebay, who was running back into the house. Fred indicated that "a lot of folks began to run" after hearing the shots. He stated that Ebay was the only person that he saw with a gun.

*E. Demario ("Mario") Wright Identifies Ebay as the Shooter*

{¶12} Mario testified that he knew Williams before the night of the incident and that he has seen him around "at the rec."

{¶13} According to Mario, he believed that there was going to be a fight outside between Williams and Dalleo once everyone exited the house but that "after we got outside, nobody actually fought. They were just breaking it up." Mario testified that he, as well as Williams, were outside in the middle of the street. Mario stated that Kortez was by the back of a car bumper, away from Mario and Dalleo.

{¶14} Mario further testified that, after he heard the first gunshot fired, he ducked and turned his head. Mario indicated that upon turning, he saw Williams with his arm extended during the second shot. He further stated that Dalleo ran after Williams following the shooting. According to Mario, he knew Williams's identity based on his hair and based on seeing him "a lot" at the "rec center" prior to the night of the party.

{¶15} On cross-examination, Mario testifed that he observed the shooter come from behind Kortez. According to Mario, Kortez was looking toward him. Mario also testified that he did not see anyone other than Williams run following the shooting.

*F. Autopsy Report and Findings*

{¶16} Dr. Thomas Gilson, Cuyahoga County Medical Examiner, testified that Kortez died from a gunshot to the head, which would have caused him to collapse almost immediately after the injury was received. Dr. Gilson further explained that the "bullet went from the front of the body towards the back," in a downward direction through the brain. Dr. Gilson testified that "[w]hen the weapon was discharged, it was in front of [Kortez]."

*G. Police Investigation*

{¶17} Cleveland police officer Gary Bartell testified that he responded to a call at approximately 1:04 a.m. for shots fired and a male down at East 66th and Superior. Upon arriving on the scene, Officer Bartell observed "a large crowd" gathered around the victim, later identified as Kortez McRae. Officer Bartell testified that "people are crying, yelling." He further testified that approximately 20 people were in the street upon his arrival.

{¶18} Cleveland police officer Daniel Piper testified, corroborating Officer's Bartell's testimony. According to Officer Piper, they arrived within a minute of the call and that they encountered a large crowd who was "kind of hysterical, yelling, screaming." Officer Piper testified that "there was no one running away when we pulled up" and that the crowd was asking for help for the victim.

{¶19} Officer Piper further testified that he interviewed Demario Wright on the scene and that his partner and sergeant handled the questioning and interviewing of the other witnesses on the scene. According to Officer Piper, based on the information gathered on the scene, the police broadcasted a description of the suspect as "wearing a blue and white * * * hoodie or jacket with blue jeans, and a black knit hat, scully, and that the suspect had short dreadlocks." The police further broadcasted that the suspect went by the name of "Ebay."

**{¶20}** The police collected two knit black caps from the scene, suspected blood, and a spent round. Williams was excluded as a possible match of the DNA collected from the two caps.

**{¶21}** Cleveland police detective Raymond Diaz testified that he was assigned to investigate the death of Kortez McRae. Upon being assigned the case, Det. Diaz first reviewed the responding officers' reports and then reached out to the victim's family, urging them to contact the police if they heard anything. Det. Diaz and his partner, Det. Nate Sowa, further followed up with the witnesses identified in the responding officers' report, ultimately interviewing Shawn Wright, Dalleo Wright, and Demario Wright — the only three that they were able to reach.

**{¶22}** Det. Diaz testified that Demario Wright ("Mario") knew the suspect by his street name and ultimately told the police his formal name after speaking with a female friend the night of the shooting. Det. Diaz further testified that because Mario already knew the suspect, he did not have Mario review the photo array that was compiled, using Williams's BMV photo. Det. Diaz explained that, in accordance with the department's new policy, he did not participate in showing the photo array to Dalleo and Shawn Wright; a blind administer presented the photo array to them. Det. Diaz further testified that Shawn did not pick anyone out of the photo array but Dalleo identified Williams.

**{¶23}** At the close of the state's case, Williams moved for acquittal of the charges pursuant to Crim.R. 29, arguing that the state failed to prove that he committed the crimes. The trial court denied his motion. Williams presented no witnesses at trial.

*H. Jury Verdict and Sentence*

{¶24} The jury found Williams guilty on all four counts. The trial court merged the counts as allied offenses, and the state elected to proceed on Count 1. The trial court imposed 15 years to life on the murder conviction to be served consecutive to the three-year firearm specification for a total prison term of 18 years to life.

Hearsay Testimony and In-Court Identification

{¶25} In his first assignment of error, Williams argues that the trial court erred in allowing testimony as to what the crowd was screaming following the shooting of Kortez. He claims that such testimony amounts to hearsay, which deprived him of a fair trial. The state counters that, although the statements constitute hearsay, the excited utterance exception applies and, therefore, the trial court properly admitted them. Williams fails to rebut this argument.

{¶26} The admission or exclusion of relevant evidence rests within the sound discretion of the trial court. *State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987). Absent an abuse of that discretion and a showing of material prejudice, an appellate court will not overturn a trial court's ruling. *State v. Martin*, 19 Ohio St.3d 122, 129, 483 N.E.2d 1157 (1985). The abuse-of-discretion standard is defined as "grossly unsound, unreasonable, illegal, or unsupported by the evidence." *State v. Boles*, 187 Ohio App.3d 345, 2010-Ohio-278, 932 N.E.2d 345, ¶ 18 (2d Dist.), quoting *Black's Law Dictionary* 11 (8th Ed.2004).

{¶27} Hearsay is defined in Evid.R. 801(C) as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Statements that fall under this definition are not admissible "unless an exception is made by the United States or Ohio Constitution, by Ohio statute, or by rules prescribed by this court." *Beard v. Meridia Huron Hosp.*, 106 Ohio St.3d 237, 2005-Ohio-4787, 834 N.E.2d 323, ¶ 23, citing Evid.R. 802.

**{¶28}** Under Evid.R. 803(2), an excited utterance is defined as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Evid.R. 803(2). The Ohio Supreme Court has set forth the following four-part test to determine the admissibility of statements as an excited utterance:

> (a) that there was some occurrence startling enough to produce a nervous excitement in the declarant, which was sufficient to still his reflective faculties and thereby make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs, and thus render his statement of declaration spontaneous and unreflective,
>
> (b) that the statement or declaration, even if not strictly contemporaneous with its exciting cause, was made before there had been time for such nervous excitement to lose a domination over his reflective faculties so that such domination *continued* to remain sufficient to make his statements and declarations the unreflective and sincere expression of his actual impressions and beliefs,
>
> (c) that the statement or declaration related to such startling occurrence or the circumstances of such starling occurrence, and
>
> (d) that the declarant had an opportunity to observe personally the matters asserted
>
> in his statement or declaration.

(Emphasis sic.) *Potter v. Baker*, 162 Ohio St. 488, 124 N.E.2d 140 (1955), paragraph two of the syllabus, followed and approved in *State v. Taylor*, 66 Ohio St.3d 295, 612 N.E.2d 316 (1993), fn. 2.

**{¶29}** Here, the record reveals that the crowd was in shock immediately following the firing of the two gunshots and that they screamed out immediately following the shooting, evidencing that the statement was not the product of reflective thought. And although the members of the crowd were never specifically identified, the record reflects that the crowd had spilled out into the street prior to the shooting and that Williams ("Ebay") was outside in the street at the time of the shooting. The position of the crowd evidences that they would have seen "Ebay" scream out his name following the shooting. Indeed, the fact that the bystanders were

not identified by name does not automatically preclude the admissibility of the statement. *See State v. Holdbrook*, 12th Dist. Butler No. CA2005-11-482, 2006-Ohio-5841 (although the bystanders were not identified, their testimony to police officer following a shooting was admissible as excited utterance). Under the circumstances in this case, we find that the trial court did not abuse its discretion in allowing the statement as an excited utterance where sufficient evidence exists to satisfy all four prongs of *Potter*.

**{¶30}** Williams further argues that the trial court improperly allowed "Dalleo to make an in-court identification of Williams as the shooter." Williams never objected to the testimony that he now challenges on appeal. We therefore apply a plain error standard of review. *See* Crim.R. 52. And here, we find no error, plain or otherwise.

**{¶31}** The record reveals that Dalleo made an in-court identification of Williams as the person who was stepping on his feet inside the house and the person that was running away. We find no error in the trial court allowing such testimony. Dalleo personally observed both of these incidents, and defense counsel had ample opportunity to cross-examine him on both events.

**{¶32}** To the extent that Williams generally attacks the police's administering of the photo array, he fails to identify how the police failed to comply with the requirements of R.C. 2933.83. *See* App.R. 16(A)(7). Instead, Williams broadly argues that "the procedures adopted in this case were impermissibly suggestive." We find no merit to this broad, unsupported claim.

**{¶33}** The first assignment of error is overruled.

<u>Flight Instruction</u>

**{¶34}** In his second assignment of error, Williams argues that the trial court erred in providing a flight instruction over his objection. He argues that the instruction was unwarranted "in light of the evidence that most of the up to fifty party-goers fled the scene upon hearing the

sounds of gunfire, and most also failed to return to provide information to the police." The trial court instructed the jury as follows:

> Now, testimony has been admitted indicating that the defendant fled the scene. You are instructed that the defendant's flight alone does not raise a presumption of guilt, but it may tend to indicate the defendant's consciousness of guilt, or awareness of guilt.

> If you find that the facts do not support that the defendant's flight or if you find that some other motive prompted the defendant's conduct or if you are unable to decide what the defendant's motivation was, then you should not consider this evidence for any purpose.

> However, if you find that the facts support that the defendant engaged in such conduct, and if you decide that the defendant was motivated by a consciousness or an awareness of guilt, you may but are not required to consider that evidence in deciding whether the defendant is guilty or the crime charged.

> You alone will determine what weight, if any, to give to this evidence.

{¶35} Trial courts have broad discretion in determining whether the evidence adduced at trial was sufficient to warrant a jury instruction. *State v. Mitts*, 81 Ohio St.3d 223, 228, 690 N.E.2d 522 (1998). "When reviewing a trial court's jury instructions, the proper standard of review for an appellate court is whether the trial court's refusal to give a requested instruction constituted an abuse of discretion under the facts and circumstances of the case." *State v. Sims*, 8th Dist. Cuyahoga No. 85608, 2005-Ohio-5846, ¶ 12, citing *State v. Wolons*, 44 Ohio St.3d 64, 68, 541 N.E.2d 443 (1989). "Abuse of discretion" has been described as a ruling that lacks a "sound reasoning process." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).

{¶36} We find no abuse of discretion on the part of the trial court. Flight from justice "means some escape or affirmative attempt to avoid apprehension." *State v. Spraggins*, 8th Dist.

Cuyahoga No. 99004, 2013-Ohio-2537, ¶ 24, citing *State v. Benjamin*, 8th Dist. Cuyahoga No. 80654, 2003-Ohio-281. It is not error for a trial court to give a flight instruction when there is such evidence. *Id.* In this case, Dalleo testified that Williams was the only person to run immediately following the shooting. And while Dalleo and Shawn chased Williams upon seeing him run, Dalleo immediately returned to the scene once he lost Williams during the chase, and Shawn was on the scene when the police arrived. Similarly, Mario testified that, aside from Dalleo chasing Williams, he did not see any other people running. Further, the responding officers, who arrived within minutes of the 911 call, testified that approximately 20 people were present in the street when they arrived, thereby negating Williams's claim that everyone ran from the scene. These facts distinguish this case from *State v. Johnson*, 8th Dist. Cuyahoga No. 99715, 2014-Ohio-2638, which Williams relies on in support of his claim that the instruction was not warranted.

**{¶37}** The existence of other testimony that contradicted Dalleo's statements, such as Fred Smith's testimony that he and "lots" of other people ran after hearing the shots, still does not evidence an abuse of discretion by the trial court to provide the instruction. Williams does not dispute the evidence of him fleeing the scene, along with several other people. The trial court informed the jury, however, that it could determine from the evidence whether the defendant fled the scene for some other purpose. Thus, the jury could have decided if Williams fled because he was trying to avoid the police or if he fled for safety reasons to avoid being shot. *See State v. Shabazz*, 8th Dist. Cuyahoga No. 100021, 2014-Ohio-1828, ¶ 61; *State v. Torres*, 8th Dist. Cuyahoga No. 99596, 2013-Ohio-5030, ¶ 56.

**{¶38}** The second assignment of error is overruled.

<u>Opportunity to Present Defense Witnesses and</u>
<u>Renew Crim.R. 29 Motion for Acquittal</u>

**{¶39}** Williams argues in his third assignment of error that the trial court committed plain error "in violation of R.C. 2958.11 [sic] and Crim.R. 29" by preventing him from renewing his Crim.R. 29 motion for acquittal and by failing to inquire whether "it was his desire to waive his constitutional right to present a defense."

**{¶40}** The record reveals, however, that the trial court specifically inquired as to Williams presenting defense witnesses, and he indicated that there were none. Given that Williams specifically stated on the record that he did not desire to present any witnesses after the trial court denied his Crim.R. 29 motion for acquittal, we fail to find any merit to his argument. Further, Williams fails to cite any authority that supports his argument.

**{¶41}** The third assignment of error is overruled.

Sufficiency of the Evidence

**{¶42}** In his fourth assignment of error, Williams argues that the trial court erred in denying his Crim.R. 29 motion for acquittal because the state failed to present sufficient evidence to support his conviction. We disagree.

**{¶43}** "'[S]ufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997), citing *Black's Law Dictionary* 1433 (6th Ed.1990). When an appellate court reviews a record upon a sufficiency challenge, "the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶44} Williams contends that, based on the trial court's statements in denying the motion for acquittal, the trial court was clearly mistaken as to its recollection of the evidence presented and therefore erred in denying his motion. Williams's argument, however, confuses the standard. Our review focuses on whether "after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." And here, regardless of the trial court's statements in her discussion of the motion, the state presented sufficient evidence to support the murder conviction. For example, Mario testified that he saw Williams shoot Kortez. Aside from Mario's testimony, the collective testimony of the other witnesses provided circumstantial evidence beyond a reasonable doubt that Williams fired the gun at Kortez. The state presented evidence that Williams was the only person running with a gun following the shooting and that the crowd screamed out his name following the shots. Moreover, Shawn testified that the shooter's clothes matched the same clothes of the person fighting with Dalleo earlier in the night, which the state established was Williams.

{¶45} Accordingly, construing the evidence presented in a light most favorable to the state, we find that the trial court properly denied Williams's Crim.R. 29 motion for acquittal.

{¶46} The fourth assignment of error is overruled.

Manifest Weight of the Evidence

{¶47} In his final assignment of error, Williams argues that his conviction is against the manifest weight of the evidence.

{¶48} Unlike sufficiency of the evidence, a challenge to the manifest weight of the evidence attacks the credibility of the evidence presented. *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. Because it is a broader review, a reviewing court may determine that a judgment of

a trial court is sustained by sufficient evidence, but nevertheless conclude that the judgment is against the weight of the evidence. *Id.*, citing *State v. Robinson*, 162 Ohio St. 486, 487, 124 N.E.2d 148 (1955).

{¶49} In determining whether a conviction is against the manifest weight of the evidence, the court of appeals functions as a "thirteenth juror." *Id.* In doing so, it must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine "'whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). Reversing a conviction as being against the manifest weight of the evidence and ordering a new trial should be reserved for only the "exceptional case in which the evidence weighs heavily against the conviction." *Id.*

{¶50} Williams argues that the jury "lost its way" after being presented with "erroneous and inadmissible hearsay and with in-court unreliable identifications of Williams" as the shooter. To the extent that Williams is basing his argument on the erroneous admission of evidence, we have already determined in the first assignment of error that the trial court did not err in allowing the testimony.

{¶51} Williams further attacks his conviction as being against the manifest weight of the evidence because Mario's testimony is contradicted by the forensic evidence. Specifically, Williams argues that the coroner's testimony established that Kortez was shot from the front, thereby negating Mario's claim that he saw Williams shoot Kortez from behind. While we acknowledge this conflicting evidence in the record, it is well settled that the credibility of the witnesses and the weight to be given to their testimony are primarily matters for the trier of facts

to resolve.  *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967). As the Second District has explained:

> [B]ecause the factfinder * * * has the opportunity to see and hear the witnesses, the cautious exercise of the discretionary power of a court of appeals to find that a judgment is against the manifest weight of the evidence requires that substantial deference be extended to the factfinder's determinations of credibility. The decision whether, and to what extent, to credit the testimony of particular witnesses is within the peculiar competence of the factfinder, who has seen and heard the witness.

*State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 Ohio App. LEXIS 3709 (Aug. 22, 1997).

{¶52} Even if the jury disregarded Mario's testimony, we find that Williams's murder conviction was not against the manifest weight of the evidence.   Other sufficient evidence exists in the record to support the conviction.   Indeed, as previously discussed, Shawn testified that he saw the clothes of the shooter and that the shooter's clothes matched the same clothes as the person fighting Dalleo earlier in the night.   Several witnesses identified Williams as the person fighting with Dalleo earlier in the house, prompting the party to go outside.   The state offered evidence that Williams was seen brandishing a gun while fleeing the scene and that no other person was seen with a gun at the time of the shooting.   The crowd further screamed Williams's street name immediately following the shooting. Based on the evidence in the record, we find that this is not the "exceptional case in which the evidence weighs heavily against the conviction" such that a new trial should be ordered.  *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541.

{¶53} The final assignment of error is overruled.

{¶54} Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

MARY J. BOYLE, PRESIDING JUDGE

FRANK D. CELEBREZZE, JR., A.J., and
KATHLEEN ANN KEOUGH, J., CONCUR